# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

JULIE M. PUTERBAUGH,                        :

     Plaintiff,                        :
                      Case No. 3:12cv00031

 vs.                        :

                   District Judge Thomas M. Rose

CAROLYN W. COLVIN,                        :   Chief Magistrate Judge Sharon L. Ovington
Acting Commissioner of the Social
Security Administration,                        :

     Defendant.                        :

---

# REPORT AND RECOMMENDATIONS[1]

---

## I.    Introduction

Plaintiff Julie M. Puterbaugh brings this case challenging the Social Security Administration's denial of her applications for Supplemental Security Income (SSI) and Disability Insurance Benefits (DIB).  Plaintiff protectively filed[2] her SSI and DIB applications on November 9, 2006, asserting that she has been under a "disability" since May 16, 2006.[3] (*PageID## 910-12; 913-15*).  Plaintiff claims to be disabled due to a

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

[2] A protective filing date is the date a claimant first contacted the Social Security Administration about filing for disability benefits.  It may be used to establish an earlier application date than when the Social Security Administration received the claimant's signed application.  *See* http://www.ssa.gov/glossary.

[3] Plaintiff amended her alleged onset date of disability to be March 13, 2007.  (*PageID# 855*).

"back injury, pinched nerve, depression, asthma, [and] spinal stenosis." (*PageID##* 776, 910, 913, 929).

After various administrative proceedings, Administrative Law Judge (ALJ) Thomas R. McNichols II denied Plaintiff's applications based on his conclusion that Plaintiff's impairments did not constitute a "disability" within the meaning of the Social Security Act. (*PageID##* 776-793). The ALJ's nondisability determination and the resulting denial of benefits later became the final decision of the Social Security Administration. This Court has jurisdiction to review the administrative denial of her applications. *See* 42 U.S.C. §§ 405(g), 1383(c)(3).

The case is before the Court upon Plaintiff's Statement of Errors (Doc. # 12), the Commissioner's Memorandum in Opposition (Doc. # 14), Plaintiff's Reply (Doc. # 16), the administrative record (Doc. # 11), and the record as a whole.

## II.  **Background**

### A.  **Plaintiff's Vocational Profile and Testimony**

Plaintiff was 42 years old on her alleged disability onset date, which defined her as a "younger individual" for purposes of resolving her DIB and SSI claims. *See* 20 C.F.R. §§ 404.1563(c); 416.963(c)[4]; (*PageID#* 791). Plaintiff has a high school education, and trained to work at a travel agency in 1984. (*PageID#* 810-11).

---

[4] The remaining citations will identify the pertinent DIB Regulations with full knowledge of the corresponding SSI/DIB Regulations.

Plaintiff is single, and has three children.  (*PageID#* 807).  Two of them live on their own, the other lives with her father, but stays with Plaintiff during the weekends.  (*Id.*).  Plaintiff lives in an apartment, but testified she stays there only on the weekends when her children visit.  (*PageID#* 808).  The remaining time she stays with her sister at her sister's house.  (*Id.*).  She testified she is never alone.  She stated, "I don't feel comfortable by myself.  I have a lot of anxiety from my stroke.  I'm afraid of falls.  Afraid I'll leave appliances on because I have memory problems."  (*PageID#* 808).  Plaintiff testified prior to having her stroke in March 2007, she lived independently.  (*Id.*).

Plaintiff testified she does not have a driver's license, and that her social worker drove her to the hearing.  (*PageID#* 809).  She stated she used to have a driver's license, but lost it due to her stroke, which caused her to lose half of her vision.  (*PageID#* 809-10).  According to Plaintiff, she has "no left peripheral vision at all."  (*PageID#* 810).  She stated she can "see what's in front of me and on the right side of me, but nothing on the left."  (*Id.*).

Plaintiff stated she last worked around May 2006, working part-time as a cashier.  (*Id.*).  She testified she stopped working due to pain in her back, and still has constant lower back pain.  (*PageID#* 812).  Plaintiff testified she had two surgeries: "one for a herniated disc.  When they did that surgery they found out there was a defect in the vertebrae between the L5 and S1 and those had to be fused during the second surgery.  (*Id.*).  She stated these surgeries helped, until she slipped on black ice in 2006.  (*PageID#*

3

813).  She stated since then the pain has continued, she takes pain medication, and that
"there's nothing else that can be done" by her doctors to help her back.  (*PageID#* 814).
Plaintiff stated she was prescribed a cane, and testified she uses it all the time.  (*Id.*).

       In addition to her back problems, Plaintiff testified she experienced vision loss
from her stroke.  (*PageID#* 816).  She also stated she suffered from memory loss and
anxiety as a result of the stroke.  (*Id.*).  She stated she has "a problem retaining recent
information.  For example, if I would see you on the street tomorrow, it would be likely
that I would not remember you as being my judge today."  (*Id.*).  She stated she does not
receive treatment for her vision, and that there is nothing else that can be done to help.
(*PageID#* 817).  Plaintiff stated she can still read, but "[i]t's more tiring now."  (*Id.*).

       Plaintiff also stated her stroke has caused her anxiety in social settings.  (*Id.*).  She
stated that "in groups of people more than three, especially strange people, people that
[she doesn't] know. . . . [she has] a hard time breathing . . . sweating and [her] heart
races."  (*Id.*).  She also stated she has panic attacks when she is in a large group of people,
which is approximately once a month.  (*PageID#* 818).  Plaintiff stated she goes to
counseling once a month.  (*PageID#* 819).  She has never been hospitalized for
psychological problems, and stated her counseling helps.  (*Id.*).  She stated she also sees
her psychiatrist once every three months, and her family doctor usually about once a
month.  (*Id.*).  She sees her eye doctor once a year for an exam.  (*PageID#* 820).

       As to medications, she stated she feels tired as a side effect.  (*Id.*).  Plaintiff
testified that on a scale of zero to ten, with ten being the worst pain imaginable, her pain

is typically about an eight. (*PageID#* 821). She stated her pain "goes from [her] low back into [her] hip area and it also goes down [her] leg, all the way down to [her] foot." (*Id.*). Plaintiff testified that with her medication, the level will go down to a five. (*PageID#* 822). Plaintiff stated she is most comfortable lying down, but that she often wakes up at night because of the pain and has trouble going back to sleep. (*PageID#* 822).

Plaintiff estimated she can walk no more than ten minutes at a time, and would need her cane while walking. (*Id.*). She testified if she is standing, and "moving around," she could do so for about ten minutes. (*PageID#* 823). She stated she can sit for about 20 minutes, and is able to use her arms, hands, and fingers. (*Id.*). She estimated she could lift "maybe 10 pounds" at one time using both arms and hands, and is able to climb stairs "slowly" and "with difficulty." (*Id.*). She does not believe she could go back to work because she would be in "extreme pain" due to sitting too long, and due to vision and balance problems from her stroke. (*PageID#* 824).

Plaintiff testified that she can cook in the microwave and wash a small amount of dishes. (*PageID#* 825). She testified she does not sweep, mop, or vacuum; does not wash clothes; does not make beds; and does not typically go grocery shopping. (*PageID#* 826). She testified her children do these for her. (*Id.*). She testified she does not visit friends or relatives, however, relatives come to visit her. (*Id.*). She stated she does not go to the movies, and the only hobby she has is reading a book about once a month. (*PageID#* 827). She stated she does not participate in any kind of sports, does not

5

exercise, does not do yard work or garden, and has not taken any trips outside of Ohio since her alleged onset date of disability.  (*PageID#* 827).

Plaintiff testified that she does not drink alcohol, although she used to before the stroke in 2007.  (*PageID#* 827-28).  She testified she previously used crack cocaine, but has not done so since having her stroke.  (*PageID#* 828).  She testified she is able to feed, dress, and groom herself.  (*Id.*).

Plaintiff explained that on a typical day she gets up around seven or eight in the morning, dresses herself, brushes her teeth, and maybe eats some breakfast.  (*PageID#* 829).  After this, she watches television in the morning, may make a phone call, and may check her e-mail for a little.  (*Id.*).  She stated she spends no more than 15 minutes on the computer, however, due to her back pain.  (*PageID#* 829).  She stated she usually eats lunch, and watches more television in the afternoon.  (*PageID#* 829-30).  She stated that she usually watches television with her children when they visit her on the weekends.  (*PageID#* 830).

She testified that her anxiety distracts her and keeps her from staying on task.  She claims that her vision prohibits her from being able to see obstacles that are on the ground.  (*PageID#* 840).  She believes it is a safety issue.  (*Id.*).

Plaintiff amended her alleged onset date of disability to March 13, 2007 – the date of her stroke.  (*PageID#* 855).

**B.**    **Medical Opinions**

*1.*    *Plaintiff's Physical Health*

6

Plaintiff underwent a consultative examination with Damian M. Danopulos, M.D., on January 30, 2007.  (*PageID#* 1084-88).  Dr. Danopulos noted that Plaintiff had four major complaints at the time: 1) low back pain with pain in the right down to her foot, 2) hypertension, 3) asthma, and 4) depression.  (*Id.*).  Dr. Danopulos noted that Plaintiff reported injuring her back in May 2005, when she had to lift "very heavy patients," in her job as a home health aide.  (*Id.*).  He noted that she had an MRI which showed she had a herniated disc on the left between L5-S1, and a discectomy performed on August 15, 2005.  He stated "[s]he did okay up until March 2006 when she fell on ice and reinjured her low back."  (*Id.*).

Dr. Danopulos noted that "[o]n clinical examination spine was painful to pressure in the lumbo/sacral area.  Straight leg raising was negative in the left and was triggering right buttock and right leg pain.  Lumbar spine motions were restricted and painful." (*PageID##* 1087-88).  He opined that "her ability to do any work-related activities like lifting and carrying is affected in a negative way from her lumbar spine arthritis with right-sided radiculopathy," and "[s]he cannot lift more than 15 lbs. at a time."  (*PageID#* 1088).

Thereafter, Plaintiff was hospitalized, on March 13, 2007, for unresponsiveness and mental status change.  (*PageID#* 1102).  It was suspected this resulted from an overdose of cocaine.  (*Id.*).  It was concluded that Plaintiff suffered a myocardial infarction (heart attack) and right posterior cervical artery cerebrovascular accident

(stroke) with a residual left visual field defect.  (*PageID#* 1109-1120).  On March 26, 2007, Plaintiff was discharged.  (*PageID#* 1111).

On April 9, 2007, Plaintiff was admitted to the Intensive Care Unit due to another suspected overdose of cocaine.  (*PageID#* 1161).  A drug screen performed at that time tested positive for cocaine.  (*Id.*).

An MRI of Plaintiff's lumbar spine was performed on April 20, 2007.  (*PageID##* 1177-78).  The report indicated a broad-based disc herniation at L5-S1 with bilateral foraminal stenosis, and mild encroachment upon the central canal.  (*Id.*).  There was also mild desiccation at L5-S1.  (*Id.*).

On July 5, 2007, Philip Minella, M.D., performed a lumbar laminectomy and fusion procedure on Plaintiff at L5-S1.  (*PageID##* 1222-24).  During a five week post op exam, Dr. Minella reported that Plaintiff "seems to be doing well," and that "[s]he denies any leg pain or much in the way of back pain."  (*PageID#* 1274).

On October 3, 2007, state agency reviewing physician Gerald Klyop, M.D., reviewed the medical evidence and completed a physical residual functional capacity assessment.  He opined that Plaintiff could lift, carry, push and pull no more than 20 pounds occasionally and 10 pounds frequently; stand and/or walk for approximately 6 hours in an 8 hour workday; and sit for approximately 6 hours in an 8 hour workday. (*PageID#* 1277).  Dr. Klyop noted that Plaintiff's "sensation was intact," and limited her to only occasionally stooping and climbing ladders, ropes, or scaffolds.  (*PageID#* 1278-1283).  He found that no other limitations were needed.  (*Id.*).

8

After Plaintiff participated in recommended physical therapy, Carlos Jordan, M.D., reported on September 18, 2008, that she was "almost pain free." (*PageID## 1408-1410*). He noted that Plaintiff had only "some" limited range of motion, secondary to pain in the right leg, and recommended she only use over-the-counter pain medications. (*Id.*). On December 22, 2008, Dr. Jordan reported that Plaintiff's back pain was "well-controlled" by pain injections. (*PageID# 1393*). It was noted on May 9, 2009, that Plaintiff's back pain was "mild in intensity and is occurring on an intermittent basis," however, treatment was reducing her symptoms and her "condition is improving." (*PageID# 1583*). Dr. Jordan submitted an assessment form to the Ohio Department of Job and Family Services on May 30, 2009, indicating that Plaintiff's health status was good and stable with treatment. (*PageID# 1585-86*). He offered no opinion as to any restrictions or functional limitations Plaintiff may have. (*Id.*).

On October 9, 2008, Lori Holmes, O.T.R., reported the following scores obtained by Plaintiff on a visual acuity test: far visual acuity - 20/30 on the right and 20/30 on the left; near visual acuity - 20/30 on the right and 20/20 on the left; and peripheral vision - 90 degrees on the right and 5-10 degrees on the left. (*PageID# 1337*). Ms. Holmes reported that Plaintiff had a visual field of 95 to 100 degrees. (*Id.*).

 2. *Plaintiff's Mental Health*

Plaintiff was examined by Gordon Harris, Ph.D., on August 1, 2008, at the request of the Ohio Bureau of Disability Determination. (*PageID# 1249*). During the exam, she reported that on a typical day she "gets up and eats breakfast, watches TV, and goes to the

9

grocery with her mother.  They either eat lunch out or [she] comes home and eats lunch.

She will stay in bed and watch TV the rest of the day." (*PageID#* 1251).  She reported

that she can only cook "simple things" since her stroke; is able to shop or at least walk

around a store; is not able to do any house work due to her back; does laundry; handles

her own finances; no longer drives; and made one attempt at riding a bus.  (*Id.*).  She

initially reported that she does not have any hobbies, but later indicated that she makes

blankets and completes puzzle books.  (*Id*).  She reported no difficulty with self-care or

personal hygiene.  (*Id.*).  She reported to Dr. Harris that she used cocaine from 2001 to

2006, "off and on."  (*Id.*).  She reported she only drinks alcohol on social occasions and

"is not a problem."  (*Id.*).  She attends a drug program to deal with her history of drug

use.  (*Id.*).

   Dr. Harris reported that during the course of her evaluation, Plaintiff's rate,

rhythm, volume, and quantity of speech were normal; articulation was clear; thought

processes were fluid, logical, and goal-directed; she exhibited a broad, full range of

affect; her mood was euthymic; and psychomotor activity was normal and eye contact

was good.  (*Id.*).  Dr. Harris concluded that Plaintiff's ability to understand instructions

would be unimpaired, as would her verbal processing and verbal skills.  (*PageID#* 1253).

He believed her ability to following instructions is moderately impaired by her memory

deficits.  (*Id.*).  Dr. Harris also concluded that Plaintiff's ability to maintain attention to

perform simple multi-step repetitive tasks does not appear to be impaired, nor does her

ability to relate to others, including fellow workers and supervisors.  (*Id.*).  Dr. Harris

10

believed that Plaintiff's ability to withstand the stress and pressure associated with day-to-day work activities would be moderately impaired due to the stress of the physical problems she has. (*Id.*). He believed she was capable of managing benefits if granted on her behalf. (*Id.*).

On June 28, 2007, Psychiatrist Julie Gentre, M.D., completed a Mental Status Questionnaire. (*PageID#* 1215). She stated that she first started seeing Plaintiff on June 1, 2007. (*Id.*). She noted that Plaintiff's affect was typically normal, but that she did experience depression thought the day, sometimes got confused, and did have some memory impairments. (*Id.*). Dr. Gentre believed that Plaintiff was unable to retain information and had problems following verbal directions. (*PageID#* 1215-16). She thought Plaintiff could maintain attention on one task for up to 20 minutes, was unable to multi-task, but could perform repetitive tasks. (*PageID#* 1215-16). Dr. Gentre stated that Plaintiff had chronic alcohol and drug use, and that due to her anxiety, tended to isolate herself from others and had difficulty adapting to new environments, but could get used to new situations after time. (*PageID#* 1216).

On August 7, 2007, Psychologist Vicki Casterline, Ph.D., reviewed the medical evidence and completed a mental residual functional capacity on behalf of the state agency. (*PageID#* 1256-73). She indicated that her opinion was based upon the previous consultative psychological examinations and the medical evidence of record regarding Plaintiff's March 2007 hospitalization. (*PageID#* 1258). She also found that Plaintiff had mild limitations in activities of daily living; mild restrictions with social functioning;

11

moderate difficulties maintaining concentration, persistence, or pace; and no episodes of decompensation.  (*PageID#* 1270).  Dr. Casterline opined that Plaintiff "does not appear to be more than mildly limited in ability to relate to others, maintain concentration and follow directions.  Coping with stress and pressure is moderately limited.  Claimant is capable of performing tasks in a relatively static work environment without strict production quotas."  (*PageID#* 1258).

J. Scott Fraser, Ph.D., noted on May 30, 2009, that he saw Plaintiff biweekly for therapy sessions, and that, of 20 functional areas, Plaintiff had no limitations in 15 categories, slight limitations in her ability to complete normal workday or workweek without interruptions, and moderate limitations using public transportation.  (*PageID##* 1587-88).  Dr. Fraser opined that he had no basis to judge her abilities in three other areas, but she was employable.  (*PageID#* 1587-88).

C.    **Vocational Expert Testimony**

In addition to Plaintiff, a vocational expert (VE) testified at the administrative hearing.  The VE classified Plaintiff's past work as a home health aide (medium, semi-skilled); customer service clerk (sedentary, skilled); and a telephone sales representative (sedentary, semi-skilled).  (*PageID#* 844).

The VE was asked to consider an individual with the same approximate age, education, and work experience as Plaintiff, who is restricted to light work with the following limitations: no climbing of ropes, ladders or scaffolds; no balancing; occasional stooping; no work on uneven surfaces; no more than simple one or two-step tasks

required; no more than little concentration required; no exposure to hazards, such as

dangerous machinery, unprotected heights, and "things of that nature."  (*PageID#* 845).

With those restrictions, the VE testified that such a hypothetical worker could

perform 35,000 jobs at the light level, such as an office helper and a photocopy machine

operator.  (*Id.*).  If the same restrictions applied, but the jobs were sedentary, the ALJ

testified there would be at least 8,000 jobs available, such as a type copy examiner and an

addressor.

If an additional limitation requiring Plaintiff be provided with an opportunity to

alternate between sitting and standing as needed was included, the VE testified the

number of light jobs available would be reduced to about 20,000.  (*PageID#* 846).  The

VE did not believe this limitation would reduce the number of sedentary positions

available.

Regarding Plaintiff's limited peripheral vision, the VE testified as follows:

ALJ:   If we add a limitation of no peripheral vision to the left and again, keeping
       in mind that the claimant is right handed, can you factor that in and tell me
       what effect, if any, it would have on the light or sedentary jobs?

VE:    You Honor, I tried to pull up some of that information in the <u>DOT</u>.  The
       <u>DOT</u> talks about field of vision.  And I can read what that is to you. . . .
       Field of vision is described as observing an area that can be seen up and
       down or to the left and right when eyes are fixed on a given point.  This
       factor is important when job performance requires seeing a large area while
       keeping the eye fixed.  So with that description, Your Honor, it doesn't
       appear that any of the jobs I have, have got a large area or requires seeing a
       large area while keeping the eye fixed.  So I do believe we are – most of the
       work is pretty much done in front of the person.  I don't believe there'd be a
       change in the numbers or examples..

(*PageID#* 847). The VE also was asked to consider an additional limitation requiring the use of a cane to ambulate. If such a requirement was present, the VE testified the number of remaining light jobs would be reduced to approximately 8,000. (*Id.*). The VE did not believe there would be an additional reduction in the number of sedentary jobs, however. (*Id.*).

The ALJ also asked the VE to consider a requirement limiting lifting to no more than 10 pounds. (*Id.*). The VE testified that such an additional restriction would reduce the number of jobs at the light level down to 5,000, and would have no impact on the number of jobs at the sedentary level. (*Id.*). If an additional limitation was added requiring low stress jobs, defined as no production quotas and no fast paced work, the VE testified there would be no additional reduction in the number of light jobs, but the number of jobs at the sedentary level would be further reduced to 4,000.

The ALJ provided an additional limitation, requiring no exposure to the general public. With this restriction, the VE testified the number of light jobs available would not be reduced, however, the number of sedentary positions would be further reduced to approximately 2,500. (*PageID#* 848).

Upon cross-examination by Plaintiff's counsel, the VE was asked to consider a hypothetical worker who "had to take an inordinate amount of time to complete a task," and to consider if that would "lead to eventual disciplinary action against that employee." (*PageID#* 852).

14

The VE testified that, if a person consistently is not able to complete the essential functions of the job in a timely matter, or within an eight-hour day (or whatever the day is), then this would lead to disciplinary action against the employee.  (*Id.*).

In his closing argument, Plaintiff's counsel asked – due to the complexity of the visual field problem – for additional time to submit evidence regarding the issue.  In response, the ALJ stated:

> Why don't I hold the record open for 15 days – to offer that – give me any more medical expert you – or any more evidence you have and I will in turn perhaps either set a further hearing with a medical expert here to testify – or at least have a medical expert or ophthalmological expert review all the evidence and testify, you know, form interrogatories or in some way.  And address that issue of whether the listing is met or equaled.

(*PageID# 857*).

## III.   <u>Administrative Review</u>

### A.      <u>"Disability" Defined</u>

To be eligible for SSI or DIB a claimant must be under a "disability" within the definition of the Social Security Act.  *See* 42 U.S.C. §§ 423(a), (d), 1382c(a).  The definition of the term "disability" is essentially the same for both DIB and SSI.  *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).  Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies.  *See Bowen*, 476 U.S. at 469-70 (1986).

A DIB/SSI applicant bears the ultimate burden of establishing that he or she is under a disability.  *See Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *see Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

### B.    ALJ McNichol's Decision

ALJ McNichols resolved Plaintiff's disability claim by using the five-Step sequential evaluation procedure required by Social Security Regulations.  *See PageID## 776-93; see also* 20 C.F.R. § 404.1520(a)(4).  His pertinent findings began at Step 2 of the sequential evaluation where he concluded that Plaintiff had the following severe impairments: chronic low back pain; status-post discectomy and fusion procedures; peripheral vision loss on the left; status-post stroke-like episodes; depression; and anxiety. (*PageID#* 778).

The ALJ concluded at Step 3 that Plaintiff did not have an impairment or combination of impairments that met or equaled the criteria in the Commissioner's Listing of Impairments.  (*PageID#* 781).

At Step 4, the ALJ concluded that Plaintiff retained the residual functional capacity (RFC) to perform sedentary work, except that she can lift no more than 10 pounds at a time; needs an opportunity to alternate positions between sitting and standing as needed throughout the workday; requires the use of a cane to ambulate; is unable to work on uneven surfaces; has no peripheral vision on the left; can never balance or climb ladders, ropes, or scaffolds; can only occasionally stoop; can tolerate no exposure to

16

hazards, such as dangerous machinery and unprotected heights; must involve no more than simple, one- or two-step tasks (requiring little, if any, concentration); no exposure to the general public; work must be low stress, defined as no production quotas and no fast-paced production work.  (*PageID#* 782).

The ALJ concluded at Step 4 that Plaintiff is unable to perform her past relevant work.  (*PageID#* 791).  At Step 5, the ALJ concluded that Plaintiff could perform a significant number of jobs in the national economy.  (*PageID#* 792).

The ALJ's findings throughout his sequential evaluation led him to ultimately conclude that Plaintiff was not under a disability and was therefore not eligible for DIB or SSI.  (*PageID#* 793).

**IV.**    **Judicial Review**

Judicial review of an ALJ's decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F3d 742, 745-46 (6th Cir. 2007).

Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings.  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999).  Instead, the ALJ's factual findings are upheld if the substantial evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as

adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)).  Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance..." *Rogers*, 486 F.3d at 241.

The second line of judicial inquiry – reviewing for correctness the ALJ's legal criteria – may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings.  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F3d at 746.  "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

**V.** **Discussion**

   **A.**   **The Plaintiff's Contentions**

Plaintiff raises the following five arguments: 1) the ALJ erred in the assessment of her lumbar pathology when he found that her medical condition was consistent with full-time sedentary work; 2) the ALJ relied upon improper vocational testimony to assess her visual field loss and therefore erred in the creation of his hypothetical question; 3) the ALJ erred in his assessment that her mental condition improved over time in a manner that allowed for sustained gainful employment; 4) the ALJ's treatment of the opinion of

18

psychiatrist Julie P. Gentre, M.D., was inconsistent with the Commissioner's rules and her findings were afforded inappropriate weight under the Commissioner's Regulations; and 5) the ALJ relied upon evidence which existed before her amended onset date in order to form his opinions regarding medical severity, credibility, and residual functional capacity, and the inclusion of evidence before the amended onset date was inappropriate and deprived the claimant of a fair hearing.  (*PageID#* 1710).

The Commissioner contends that substantial evidence supports the ALJ's residual functional capacity finding with respect to Plaintiff's physical impairments; the ALJ reasonably relied on the vocational expert's testimony; the ALJ evaluated Plaintiff's mental impairments appropriately and properly discounted Dr. Gentre's assessment; the ALJ did not have to give any special consideration to GAF scores; Plaintiff was unharmed by discussion of evidence prior to her amended onset date; and the Commissioner's decision should be affirmed.  (*PageID#* 1755).

### B.  Medical Source Opinions

### 1.

### Treating Medical Sources

The treating physician rule, when applicable, requires the ALJ to place controlling weight on a treating physician's or treating psychologist's opinion rather than favoring the opinion of a nonexamining medical advisor or a one-time examining physician or psychologist or a medical advisor who testified before the ALJ.  *Blakley,* 581 F.3d at 406 (6th Cir. 2009); *see Wilson*, 378 F.3d at 544 (6th Cir. 2004).  A treating physician's opinion

is given controlling weight only if it is both well supported by medically acceptable data and if it is not inconsistent with other substantial evidence of record. (*Id.*).

"If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship and the frequency of the examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakley,* 581 F.3d at 406 (citing *Wilson*, 378 F.3d at 544).

More weight is generally given to the opinions of examining medical sources than is given to the opinions of non-examining medical sources. *See* 20 C.F.R. § 404.1527(c)(1)[5]. Yet the opinions of non-examining state agency medical consultants have some value and can, under some circumstances, be given significant weight. This occurs because the Commissioner views such medical sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." Social Security Ruling 96-6p. Consequently, opinions of one-time examining physicians and record-reviewing physicians are weighed under the same factors as treating physicians including supportability, consistency, and specialization. *See* 20 C.F.R. § 404.927(c), (e); *see also* Ruling 96-6p at *2-*3.

---

[5]20 C.F.R. §§ 404.1527 and 416.927 were amended effective March 26, 2012. The provisions governing the weight to be afforded a medical opinion were previously found at 20 C.F.R. §§ 404.1527(d) and 416.927(d).

**2.**

**<u>Non-Treating Medical Sources</u>**

The Commissioner views non-treating medical sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act."  Social Security Ruling 96-6p, 1996 WL 374180 at *2.  Yet the Regulations do not permit an ALJ to automatically accept (or reject) the opinions of a non-treating medical source.  *See id.* at *2-*3.  The Regulations explain, "In deciding whether you are disabled, we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive." 20 C.F.R. § 404.1527(b).  To fulfill this promise, the Regulations require ALJs to evaluate non-treating medical source opinions under the factors set forth in § 404.1527(d) including, at a minium, the factors of supportability, consistency, and specialization.  *See* 20 C.F.R. § 404.1527(e); *see also* Ruling 96-6p at *2-*3.

      **C.**      **<u>Discussion</u>**

**1.**

Plaintiff contends the ALJ erred in the assessment of her lumbar pathology when he found that her medical condition was consistent with sedentary full-time work. (*PageID#* 1721).  Plaintiff argues the ALJ merely "cherry picked" the evidence in order to reach this conclusion.  Plaintiff's argument lacks merit, however, as the Court finds that substantial evidence supports the ALJ's conclusion that Plaintiff could perform a reduced range of sedentary work.

21

Plaintiff had back surgery in July 2007.  Six weeks later, Dr. Minella reported that
Plaintiff "seems to be doing well," and that "[s]he denies any leg pain or much in the way
of back pain."  (*PageID#* 1274).  In August 2007, she reported she had surgery to Dr.
Harris, and that she only expected a two to three month recovery period.  (*PageID#*
1250).  At that time, Plaintiff stated that she was able to go to the grocery with her
mother, and could shop or at least walk around the store.  (*Id.*).  She also reported that her
"ambulation is better now than before the surgery," although she did still report she
suffered from sciatic pain.  (*Id.*).  A few months later, state agency reviewing physician
Dr. Klyop reviewed the medical evidence and concluded that Plaintiff could still perform
a reduced range of light work.  (*PageID#* 1277).  Upon examination by Carlos Jordan,
M.D., in September 2008, it was reported that Plaintiff "is almost pain free."  (*PageID#*
1409).  Dr. Jordan also recommended that "[s]ince pain is not as severe, I told her that she
could use over-the-counter nonsteroidals in order to have some improvement.  I
recommend [for] her to take ibuprofen 400 mg p.o. q.4-6 h. p.r.n. for pain and she has
agreed."  (*Id.*).

In May 2009, it was noted that Plaintiff reported "[b]ilateral upper back stiffness
happening occasionally," and that she "specifies her upper back discomfort as mild in
intensity."  (*PageID#* 1583).  Dr. Jordan noted that Plaintiff's health status was
good/stable with treatment. (*PageID##* 1585-86).

The ALJ accordingly provided significant weight to the opinions of Drs.
Danopulos, Albert, and Klyop, and determined "their assessments are supported by

22

medical signs and findings upon examination and are generally consistent with the substantial medical evidence of record." (*PageID#* 789). The ALJ's finding with respect to these opinions is supported by substantial evidence. In addition, despite Plaintiff's own reports of "mild" back pain and improvements in back pain, the ALJ nevertheless gave her the benefit of the doubt, and limited her to a reduced range of sedentary work. (*Id.*). Even taking into consideration that the opinions of Drs. Albert and Danopulos were provided before Plaintiff had her stroke, Dr. Klyop's assessment, as well as Plaintiff's own reports of pain levels, occurred afterwards and provide substantial evidence to support the ALJ's conclusion. Moreover, Defendant correctly notes that no doctor thought Plaintiff's back impairment was disabling. For these reasons, Plaintiff's argument lacks merit.

**2.**

Plaintiff also contends that the vocational expert's testimony cannot be the basis for a decision based on substantial evidence because she offered testimony which misunderstood the importance of a full visual field upon work, work efficiency, and safety. (*PageID#* 1724). Similarly, Plaintiff also argues that the ALJ failed to explain how his RFC accommodated safety hazards in the work environment, in relation to Plaintiff's vision issues.

Plaintiff's visual acuity test, performed in October 2008, showed peripheral vision of 90 degrees on the right, but only 5 to 10 degrees on the left (visual field of 95 to 100 degrees). (*PageID#* 1337). As such, the ALJ provided a limitation in his hypothetical

for the VE to "add a limitation of no peripheral vision to the left," as well as "keep in mind that [Plaintiff] is right handed."  (*PageID#* 847).  The VE turned to the Dictionary of Occupational Titles for guidance on "field of vision," and informed the ALJ that the DOT describes a field of vision "as observing an area that can be seen up and down or to the left and right when eyes are fixed on a given point," and that "[t]his factor is important when job performance requires seeing a large area while keeping the eye fixed."  (*Id.*).  The VE then stated that "with that description . . . it doesn't appear that any of the jobs I have, have got a large area or requires seeing a large area while keeping the eye fixed.  So I do believe we are – most of the work is pretty much done in front of the person.  I don't believe there'd be a change in the numbers or examples."  (*Id.*).

Plaintiff argues that because the visual field can be disabling if an individual cannot avoid ordinary hazards in the workplace, the ALJ should have also explained "how his presentation of the hypothetical embraced the unique visual field losses that the [she] had."  (*PageID#* 1762).  Plaintiff contends that her "testimony described in great detail that she had difficulty seeing things on the floor as well as experiencing a constant fear about hazards around her."  (*PageID#* 1762)(citing *PageID#* 840).  Plaintiff's argument lacks merit.

The ALJ properly incorporated Plaintiff's diminished left peripheral vision by instructing the VE to add such a limitation in the hypothetical he provided to her.  The VE relied upon the DOT regarding the definition of "field of vision," and considering such definition, concluded that the number of available jobs would not be diminished.  This

24

hypothetical accurately portrays Plaintiff's limited peripheral vision, and thus, the VE's testimony provides substantial evidence for the ALJ's finding.  *See Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) ("Substantial evidence may be produced through reliance on the testimony of a vocational expert (VE) in response to a 'hypothetical' question, but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments.").

Plaintiff believes, due to her left peripheral vision issues, the ALJ should have also added a restriction, or specifically addressed, how ordinary hazards (i.e., boxes on the floor, doors ajar, approaching people or vehicles) might limit her ability to perform sedentary jobs.  Yet, aside from her own testimony, the record does not otherwise support finding that Plaintiff cannot avoid ordinary hazards.  The ALJ therefore was not required to include an additional restriction to address such a complaint.  *See Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 118-19 (6th Cir. 1994) ("[T]he ALJ is not obliged to incorporate unsubstantiated complaints into his hypotheticals.").  Moreover, to the extent Plaintiff relies on her cane to walk, the ALJ specifically took this fact into consideration in his hypothetical when he asked the VE to "add a limitation of use of a cane to ambulate."  (*PageID#* 847).  The ALJ added this limitation <u>despite</u> the fact that he also noted numerous inconsistencies with statements Plaintiff has made regarding her ability to walk.  For example, Plaintiff reported using her cane "all the time," but her sister stated in June 2007 that Plaintiff was not using a cane or walker (*PageID#* 968); Plaintiff's occupational therapist reported in October 2008 that Plaintiff walked without assistive

devices (*PageID#* 1337); and Plaintiff informed Dr. Klyop in August 2007 that she goes out to lunch and grocery shopping with her mother (and is able to walk around the store) (*PageID#* 1250). There is also no opinion from a physician that she would require any visual limitations or that her limited peripheral vision on the left would be disabling because she is unable to avoid ordinary hazards.

As the Court finds the ALJ's hypothetical accurately portrays Plaintiff's peripheral vision impairment, his reliance upon the VE's testimony provides substantial evidence to support his finding that Plaintiff could perform jobs in significant numbers in the national economy and is therefore not disabled. Thus, Plaintiff's argument lacks merit.

**3.**

Plaintiff next argues that the ALJ erred in finding that Plaintiff's mental condition improved over time in a manner that permitted sustained gainful employment. (*PageID#* 1724). Plaintiff noted that her GAF score was 52 on April 2, April 25, July 18, and August 15, 2008, and was 50 on January 3, June 20, July 6, and September 29, 2009, and January 13, 2010. (*PageID##* 1724-25). Plaintiff contends that "[o]nly the individuals who are providing active care and treatment for [her] are in a position to be awarded a higher level of reliability with regard to GAF scores." (*PageID#* 1725). Plaintiff also contends that her anxiety significantly increased after her stroke and that reliance upon higher scores prior to her stroke was improper.

Defendant contends that Plaintiff's argument is unpersuasive because her GAF scores over time were consistent. Defendant contends that Plaintiff was mostly assigned

a score of 52, which indicates only moderate symptoms and limitations, and is consistent with the ALJ's determination that Plaintiff was not disabled. (*PageID#* 1752). Defendant also contends that the scores were assigned by social workers and counselors who are not doctors, and are not considered acceptable medical sources by Agency regulations. (*Id.*).

The Court finds that Plaintiff's argument lacks merit. Plaintiff appears to believe the ALJ should have treated her GAF scores as a substitute for medical opinions from acceptable medical sources. Yet, there is nothing to suggest there exists "any statutory, regulatory, or other authority requiring the ALJ to put stock in a GAF score in the first place." *Kornecky*, 167 Fed. Appx. at 511. Moreover, a GAF score is merely "a subjective determination that represents the clinician's judgment of the individual's overall level of function." *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 276 (6th Cir. 2009) (internal quotation marks and citation omitted). "A GAF score is thus not dispositive of anything in and of itself, but rather only significant to the extent that it elucidates an individual's underlying mental issues." *Oliver v. Comm'r of Soc. Sec.*, 415 Fed. Appx. 681, 684 (6th Cir. 2011)(citations omitted). In addition, the counselors and social workers who provided the GAF scores did not submit an assessment regarding Plaintiff's functional limitations. Accordingly, the ALJ was not required to assign any weight to their treatment notes or GAF scores.

**4.**

Plaintiff further argues that the ALJ's treatment of the opinion of psychiatrist Julie P. Gentre, M.D., was inconsistent with the Commissioner's rules and that her findings were afforded inappropriate weight under the Commissioner's Regulations.  (*PageID#* 1725).  Plaintiff contends that the ALJ erred by not considering Dr. Gentre as a "treating source" because she only treated her for one month prior to completing the assessment.  (*PageID#* 1725).  According to Plaintiff, Dr. Gentre should be considered a treating psychiatrist because she treated with her on August 23, October 11, November 1, and December 20, 2007, as well as January 17, 2008.  (*Id.*).  Plaintiff argues Dr. Gentre's opinion should be provided significant weight because it is consistent and because she was the first provider to treat Plaintiff after her stroke.  (*PageID#* 1726).

Defendant contends that the ALJ gave "good reasons" for discounting the two work assessment forms completed by Dr. Gentre.  (*PageID#* 1747).  Defendant argues that the ALJ properly presumed that Dr. Gentre only saw Plaintiff a few times before completing her June 2007 assessment, and thus, she could not be considered a treating physician, regardless of whether Plaintiff saw her on more occasions after the assessment form was completed.  (*PageID#* 1748).

Upon review of the record, the Court finds the ALJ did not err in determining that Dr. Gentre was not a treating physician.  To qualify as a treating source, a physician must have an "ongoing treatment relationship" with the claimant.  20 C.F.R. § 404.1502.  Whether an ongoing treatment relationship exists is determined at the time the physician's opinion is rendered.  *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 506 (6th Cir.

2006) ("[T]he relevant inquiry is . . . whether [claimant] had the ongoing relationship with [the physician] at the time he rendered his opinion. [V]isits to [the physician] after his RFC assessment could not retroactively render him a treating physician at the time of the assessment."). At the time Dr. Gentre rendered her opinion, in June 2007, Plaintiff had, at most, only had two or three visits with her. The Sixth Circuit has declined to find that an ongoing treatment relationship exists after just two or three examinations. *See*, *e.g.*, *Boucher v. Apfel*, 2000 U.S. App. LEXIS (6th Cir. 2000); *Yamin v. Comm'r of Soc. Sec.*, 67 F. App'x 883, 885 (6th Cir. 2003); and *Helm v. Comm'r of Soc. Sec.*, 405 Fed. Appx. 997, at *3 n.3 (6th Cir. 2011).

Plaintiff's argument is also unpersuasive because, even if the ALJ erred in finding Dr. Gentre was not a "treating" source, he nevertheless provided an alternative analysis, in which he <u>did</u> consider Dr. Gentre as a treating source, yet nonetheless provided her opinion little weight as he determined her opinion was "inconsistent with the relatively normal findings upon mental status examinations in the record." (*PageID#* 790). This finding is also supported by substantial evidence. Plaintiff's argument therefore lacks merit.

**5.**

Plaintiff also challenges the ALJ's ability to consider medical evidence prior to her amended onset date in March 2007. Plaintiff contends that because the stroke she had worsened her anxiety and caused her to have a diminished visual field, as well as

dizziness and back pain, it was improper for the ALJ to consider any medical evidence prior to this time period.  (*PageID#* 1727).

Plaintiff's contentions would have merit if the ALJ *only* considered evidence prior to her stroke (and amended onset date of disability), however, that is not the case.  The ALJ considered evidence from before, as well as after, Plaintiff's stroke.  Moreover, despite Plaintiff's argument otherwise, the ALJ did not improperly use the evidence he considered prior to Plaintiff's stroke to "give[] the false impression that [Plaintiff's] capabilities are greater than they are."  (*PageID#* 1727).  The ALJ provided accurate dates for the records he cited to (from before <u>and</u> after the stroke in 2007) and on many occasions even specifically noted that the exhibit being discussed was from prior to the amended alleged disability onset date.  (*See PageID##* 778-91).  He did not try to somehow misrepresent the evidence, as Plaintiff contends.

The Court is unaware of, and Plaintiff has not cited to, any rule, regulation, or case prohibiting an ALJ from considering evidence in the record simply because it is from prior to an alleged disability onset date.  Despite Plaintiff's contentions otherwise, the Court does not find the ALJ improperly used such evidence or that it was somehow "irrelevant."  As the ALJ's findings are supported by substantial evidence, and for the reasons stated above, Plaintiff's argument is without merit.

## IT IS THEREFORE RECOMMENDED THAT:

1. The Commissioner's non-disability determination be AFFIRMED; and

2.     The case be terminated on the docket of this Court.


August 2, 2013                                    s/ Sharon L. Ovington
                                                    Sharon L. Ovington
                                        Chief United States Magistrate Judge




**NOTICE REGARDING OBJECTIONS**

        Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within fourteen days after being served with a copy thereof.

        Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See, United States v. Walters,* 638 F. 2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474

U.S. 140 (1985).